IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| TERRY CAYS, individually and on behalf of similarly situated individuals,<br><br>*Plaintiff,*<br><br>*v.*<br><br>THE UNITED STATES,<br><br>*Defendant.* | 20-1174 L |

**CLASS ACTION COMPLAINT FOR INVERSE CONDEMNATION**

Plaintiff Terry Cays ("Cays" or "Plaintiff") brings this Class Action Complaint against the United States of America (the "United States" or "Defendant") to, without limitation, obtain just compensation, damages, and restitution, for a taking which damaged Plaintiff and the putative Class and substantially interfered with Plaintiff's and the Class's use and enjoyment of their real properties by the operation of EA-I8G "Growler" jets from Naval Air Station Whidbey Island ("NASWI" or "Ault Field") and the Naval Outlying Landing Field Coupeville ("NOLF Coupeville" or "NOLF") over and around Plaintiff's and the Class members' properties. Plaintiff alleges as follows based upon personal knowledge as to himself and his own acts, and on information and belief as to all other matters.

**STATEMENT OF JURISDICTION**

1.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1491(a)(1) as this action seeks monetary compensation from the United States, pursuant to the Fifth Amendment to the U.S. Constitution, for the taking of Plaintiff's and the putative Class members' private properties for public use without just compensation.

**PARTIES**

2. Plaintiff Terry Cays is an individual and resident of Washington state, and at all relevant times was and remains a property owner on Whidbey Island, in Island County, Washington (the "Island").

3. Defendant is the United States of America, acting through the Department of Defense, Department of the Navy, which at all relevant times operated, and was responsible for all flight operations in connection with, NASWI and NOLF on the Island.

**NATURE OF THE ACTION**

4. NASWI is a naval air station of the United States Navy (the "Navy") located on two pieces of land near the Island's City of Oak Harbor and Central Whidbey's Town of Coupeville. The combined population of Central Whidbey Island, the City of Oak Harbor, and North Whidbey Island where the Navy operates is approximately 73,000 as of 2017.

5. The main portion of the NASWI base known as Ault Field is located in Oak Harbor. Ault Field is a busy, multi-mission 24-hour-a-day operational facility. NASWI supports the MH-60S Seahawk helicopter and the Boeing EA-18G Growler, P-3C Orion, P-8 Poseidon, EP-3E SPIRAL 3.2.5 MERLIN, and C-40 Clipper fixed-wing aircraft.

6. The Navy conducts Field Carrier Landing Practice ("FCLP") by carrier-based jets, such as the EA-18G Growler (the "Growler"), at Ault Field and NOLF. Other types of operations are delayed during FCLP training at Ault Field. Due to the increasing density of aircraft operations at NASWI, the Navy uses Ault Field and NOLF Coupeville simultaneously to handle the greater volume of operations and attendant air traffic.

7. An operation is defined as either a takeoff or landing. The majority of operations occur at Ault Field. The Navy also uses Ault Field as a backup to the NOLF for FCLP during

inclement weather.

8.     During FCLP, the Navy performs repetitive "touch-and-go" landings at airfields, which simulate landing on an aircraft carrier. FCLP training exercises involve groups of aircraft flying in patterns to practice touch-and-go landings.

9.     Each aircraft in turn approaches the runway and touches down, but then takes off again without coming to a stop. The aircraft then loops around and prepares for another landing. During FCLP each aircraft makes multiple touch-and-go landings before stopping to refuel. *See* Figure 1.



**Figure 1**.[1]

10.    When the Navy pilot "touches down" on the landing strip, he or she applies full power to the aircraft to take off. This maneuver often requires the use of afterburners on the aircraft and thus creates excessive noise.

11.    FCLP flight training precedes aircraft carrier landing operations and simulates, as near as practicable, the conditions encountered during such landings.

12.    During takeoff and landing at Ault Field or NOLF, whether during FCLP or otherwise, jet aircraft fly at low altitudes over the many private properties surrounding the landing strip. Noise levels of engines for fighter jets such as the Growler equal or exceed 150 decibels

---

[1] Field Carrier Landing Practice, United States Fleet Force Command, https://www.public.navy.mil/usff/environmental/Pages/aircrafttraining.aspx

("dB") at takeoff which is well above the minimum 75 dB noise level identified by the National Academy of Sciences Committee on Hearing, Bioacoustics, and Biomechanics as the minimum level at which hearing loss occurs.

13. The Navy has conducted flight operations, including FCLP on Whidbey Island since 1967, but the amount of that use has varied dramatically. From 1967 through 1971, the Navy used the Ault Field and NOLF landing strips extensively. After the Vietnam War ended, the Navy's use of Ault Field and NOLF significantly declined.

14. Following the Vietnam War, the Navy began flying the EA-6B Prowler (the "Prowler") on the Island, and during the 1980's once again began increasing the number of operations and FCLP touch-and-go landings at Ault Field and NOLF. Predictably, litigation ensued[2] and, in addition to paying compensation to Whidbey Island property owners, the Navy ultimately agreed to limit its operations to aircraft with a noise level comparable to, or lower than, the Prowler, and fly fewer flights per year. The Navy had until recently also limited FCLP training flights since the 1990s to weekdays, and not after 10:30 p.m., and with not more than two consecutive days of touch-and-go operations.

15. In and around January 2009, the Navy began accepting its first Growlers to replace the EA-6B Prowlers. The Growlers are equipped with two General Electric F414 engines capable of producing 14,000 pounds of thrust each and 22,000 pounds of thrust with the afterburner. By comparison, the outgoing Prowlers only produced 10,400 pounds of thrust from each one of its two turbojet engines.

16. Since the Growler was first introduced in and around 2009, the number of flights and

---

[2] *See, e.g.*, *Argent v. United States*, 124 F.3d 1277, 1278 (Fed. Cir. 1997).

operations at Ault Field and the NOLF has risen. Commencing in and around 2012-2013, the Navy began planning to further increase flight operations at Ault Field and the NOLF with additional Growler jets. The Navy officially released its draft Environmental Impact Statement in November 2016, publicly announcing its plans to make NASWI the center of activity for all Growler operations. *See* Figure 2.



**Figure 2**.[3]

17.     Then, on or about June 25, 2018, the Navy announced it was relocating 36 additional Growlers and supporting personnel to NASWI. The Navy published its final Environmental Impact Statement ("EIS") on September 28, 2018.[4] On March 8, 2019, the Navy announced its decision under Section 106 of the National Historic Preservation Act to centralize and expand Growler

---

[3] Growler Aircraft Operations at NAS Whidbey Island and OLF Coupeville, https://www.cnic.navy.mil/content/dam/cnic/cnrnw/pdfs/NASWIfactsheets/Whidbey%20Island%20Growler%20OPS%20OLF%20Brochure.pdf.

[4] Environmental Impact Statement for EA-18G "Growler" Airfield Operations at Naval Air Station Whidbey Island Complex, WA, September 2018, prepared by United States Department of the Navy.

squadron operations on the Island even though it would have a harmful effect on the Central Whidbey Island Historic District.

18.  On or about March 12, 2019, the Navy made final its decision to bring 36 additional Growler jets to the NASWI, for now bringing the total number to 112. Under the March 12, 2019 Record of Decision (the "Record of Decision") for the Final Environmental Impact Statement for EA-18G Growler Airfield Operations at Naval Air Station Whidbey Island Complex, Island County, Washington, the Navy will not only add 36 Growler aircraft to Naval Air Station Whidbey, but will also increase the number of operations from 84,700 to 112,100, including an increase in total FCLP operations from 17,400 to 29,600.

19.  The Navy's decision establishes two new expeditionary squadrons at NASWI. The Navy's Record of Decision states that an estimated 112,100 operations will occur annually, with 88,000 operations at the busy, multi-mission Ault Field and 24,100[5] at NOLF Coupeville. Thus, roughly three out of four total aircraft operations will be supported by Ault Field when compared to NOLF. Specifically, the Navy will conduct 97,500 of the FCLP operations by Growlers, 73,800 of which will be at Ault Field and 23,700 of the operations at NOLF Coupeville.

20.  The Navy's increased and continued ramping up of Growler flight operations, including touch-and-go practices and changes in flight patterns, at Ault Field and NOLF Coupeville has resulted in an increase in overflights around and directly over the Plaintiff's and the putative Class members' properties. The flights occur in the afternoons and evenings, and night flights occur several times per week and continue into early mornings.

---

[5] Each operation translates to 12,050 touch-and-go flights at NOLF.



**Figure 3**.[6]

21.     Prior to 2016, there were approximately 64,300 Growler operations at Ault Field. As of today, the Navy is increasing Growler operations at Ault Field by nearly 10,000, to a total of 73,800 operations. In addition to the increase in Growler operations, the actual manner in which the Growler operations are conducted is significantly different from the flight patterns of prior operations resulting in high average DNL (also known as the Day-Night Average Sound Levels) noise contours in the area. *See* Figure 3.

22.     The Navy's website states that "flying can occur any day of the week depending on mission needs" and on weekends if "dictated by mission needs."[7] The Navy admits it cannot

---

[6] https://www.cnic.navy.mil/content/dam/cnic/cnrnw/pdfs/NASWIfactsheets/Whidbey%20Island%20Growler%20OPS%20OLF%20Brochure.pdf

[7] *See* EA-18G Growler Airfield Operations, https://www.cnic.navy.mil/regions/cnrnw/installations/nas_whidbey_island/om/environmental_support/growler-fact.html (last visited August 10, 2020).

predict how bad the impact of increased Growler and other aircraft operations on Island residents will be as the number of Growler and other aircraft at NASWI continues to steadily increase.

23. The Noise Control Act of 1972, 42 U.S.C. § 4901 *et seq.*, requires federal agencies, and state and local governments to develop measures to control the harmful effects of noise on the public. To conform with the Noise Control Act, the Department of Defense initiated the Air Installation Compatible Use Zone ("AICUZ") program to protect the public's health, safety and welfare, and to prevent encroachment on military installations.

24. The AICUZ program identifies uses that are compatible and incompatible with noise levels emanating from activities on military installations. One part of the AICUZ program is to prepare a noise study to define noise exposure contours. In other words, a map showing a graphical display of noise impacts from air operations on the surrounding property.

25. The AICUZ map generally shows three noise exposure contours: (a) 65-69 dB DNL; (b) 70-74 dB DNL; and (c) 75 dB DM, and greater. *See* Figure 4.

**ISLAND COUNTY**
AICUZ NOISE ZONES

[Map of Island County AICUZ Noise Zones]

**Figure 4**.[8]

26.     Defendant, by its internal regulations known as Operational Naval Instructions ("OPNAVINST") and by general publication, has determined that properties located within a 65

---

[8] https://www.islandcountywa.gov/maps/Documents/noisezones_small.pdf

dB DNL noise zone and greater are unsuitable for residential use and development. *See* Figure 5.

| Suggested Land Use Compatibility in Noise Zones | | | | | | | |
|---|---|---|---|---|---|---|---|
| Residential Categories | Noise Zone 1 (dB DNL) | | Noise Zone 2 (dB DNL) | | Noise Zone 3 (dB DNL) | | |
| | < 55 | 55-64 | 65-69 | 70-74 | 75-79 | 80-84 | 85 + |
| Single units; detached | Y | Y¹ | N¹ | N¹ | N | N | N |
| Single units; semi-detached | Y | Y¹ | N¹ | N¹ | N | N | N |
| Single units; attached row | Y | Y¹ | N¹ | N¹ | N | N | N |
| Two units; side-by-side | Y | Y¹ | N¹ | N¹ | N | N | N |
| Two units; one above the other | Y | Y¹ | N¹ | N¹ | N | N | N |
| Apartments; walk-up | Y | Y¹ | N¹ | N¹ | N | N | N |
| Apartments; elevator | Y | Y¹ | N¹ | N¹ | N | N | N |
| Group quarters | Y | Y¹ | N¹ | N¹ | N | N | N |
| Residential hotels | Y | Y¹ | N¹ | N¹ | N | N | N |
| Mobile home parks or courts | Y | Y¹ | N | N | N | N | N |
| Transient lodgings | Y | Y¹ | N¹ | N¹ | N¹ | N | N |
| Other residential | Y | Y¹ | N¹ | N¹ | N | N | N |

**Figure 5**.

26. The Navy is warning Island residents of "a significant impact on the noise environment" on the Island,[9] reflecting the reality that more people will hear noise more often. According to the Navy, the increase in aircraft operations means the average decibel level will increase in areas near runways such that significantly more people will be living within the 65-decibel or above day-night average sound level contour of the noise map in the future as a result of increasing Growler flight operations.[10]

27. The Navy also admits the increase in aircraft noise has a real effect on property values,[11] citing a 1991 study by Marvin Frankel which found that in instances of real estate impacted by aircraft noise, "a significant segment of buyers lacked adequate information about the

---

[9] *See* EIS, Volume 1, Executive Summary at pg. ES-5, "Therefore, the Proposed Action would have a significant impact on the noise environment as it relates to aircraft operations at the NAS Whidbey Island complex."

[10] *See* Record of Decision at pg. 8.

[11] *See* EIS Volume 2, Appendix A1, § A1.3.8 "Property Values" at pg. A1-54. "Economic studies of property values based on selling prices and noise have been conducted to find a direct relation. Studies of the effects of aviation noise on property values are highly complex due to differing community environments, market conditions, and methodological approaches, so study results generally ***range from some negative impacts to significant negative impacts***." (Emphasis added.)

noise environment and often overbid, only to be disappointed after purchase."[12]

28.     The Navy admits that property owners who acquired or purchased their property when the location was not experiencing aircraft noise are the most significantly impacted.

> "Frankel classified noise-affected property owners into two groups: one that moved to the location while the environment was quiet but later became noise-impacted and another that purchased from a previous owner while the property was already noise impacted. Frankel concluded that the former group members bore the true financial burden of airport noise."[13]

The Navy also admits that property values and prices suffer from significant discounts as a result of the negative impact of aircraft noise and from increased flight operations.[14] Those owners who acquired or purchased their property after flight operations were already occurring, but later experienced an increase in aircraft noise, also experience monetary loss.[15]

## FACTS SPECIFIC TO PLAINTIFF CAYS

29.     Plaintiff Cays owns property in Oak Harbor adjacent to Dugualla Bay and less than three miles east of Ault Field. Plaintiff Cays' property is located within a noise counter zone in excess of 65 dB DNL.

30.     The Navy's FCLP training results in Growlers and other aircraft flying at low altitude around and/or over Plaintiff Cays' property resulting in excessive noise in and around his

---

[12] *Id.* citing Frankel, M., (1991), "Aircraft noise and residential property values: Results of a survey study," *The Appraisal Journal*, Jan. 1991, pp. 96–108.

[13] *Id.*

[14] *Id.* at pg. A1-55 "Enough data are available to conclude that aircraft noise has a real effect on property values. This effect falls in the range of 0.2 to 2.0 percent per dB, with the average on the order of 0.5 percent per dB.

[15] "The Effects of Aircraft Noise and Airport Activity on residential Property Values: A Survey Study," BEBR Faculty Working Paper No. 1450, 1-58, College of Commerce and Business Administration, University of Illinois Urbana-Champaign (April 1988). *See also* Frankel, Marvin. "The Impact of Aircraft Noise on Residential Property Values," Illinois Business Review, Vol. 45, No. 5, 8-13 (Oct. 1988).

home.

31. The Navy's increase of FCLP operations has led to excessive jet noise at various times during the day and in the middle of the night continuing into the early morning. For example, Plaintiff Cays has been affected by the Navy's FCLP training that, on many occasions, commenced as late as 9 pm and continued until 2 am.

32. As a result, the Navy's activity has substantially interfered with Plaintiff Cays' use and enjoyment of his property and have diminished, if not destroyed, his property value.

## CLASS ALLEGATIONS

33. **Class Definition:** Plaintiff Terry Cays brings this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and Rule 23(b)(3) on behalf of himself and a Class of similarly situated individuals defined as follows:

> All owners of residential properties located in the noise contour zone equal or greater than 65 dB DNL as identified in Figure 4.2-18 of the Noise Contour Report.[16]

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and the members of their family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

---

[16] *See* Final Environmental Impact Statement for EA-18G Growler Airfield Operations at Naval Air Station Whidbey Island Complex, https://media.defense.gov/2019/Feb/01/2002085195/-1/-1/1/CHAPTER%204%20-%20ENVIRONMENTAL%20CONSEQUENCES.PDF

34. **Numerosity**: The exact number of members of the Class is unknown and is not available to Plaintiff at this time, but individual joinder in this case is impracticable. The Class likely consists of hundreds of individuals.

35. **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the putative Class members, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include but are not limited to the following:

    a.    Whether the Navy's flight operations constitute a taking; and

    b.    Whether the Plaintiff and the Class members are entitled to just compensation.

36. **Typicality:** Plaintiff's claims are typical of other members of the Class, in that Plaintiff and the members of the Class were harmed due to Defendant's uniform wrongful conduct.

37. **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interest antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff.

38. **Policies Generally Applicable to the Class**: This class action is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class, and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply and affect members of the Class uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or laws applicable only to Plaintiff. Plaintiff and the members of the Class have suffered harm and damages as a result of Defendant's unlawful and wrongful conduct.

39. **Superiority**: This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all parties is impracticable. Furthermore, individual litigation would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions ensured.

40. Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned through additional investigation and in discovery.

## COUNT I
### Inverse Condemnation Under the Fifth Amendment of the United States Constitution
### (On behalf of Plaintiff and the Class)

55. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

56. The Fifth Amendment to the United States Constitution prohibits the Government from taking private property for public use without just compensation.

57. Plaintiff and the Class have a legally protectable interest in their properties.

58. The flight paths of the various patterns for flight operations at NASWI and NOLF, were and are over and/or in close proximity to the Plaintiff's and the Class members' properties.

59. The additional operations from the Growler jets and other aircraft as set forth herein dramatically increased the number of flight operations at NASWI and NOLF. In addition, the Growlers produce significantly higher levels of vibration, and are louder than predecessor aircraft such as the Prowler.

60. The noise and vibration from the regular, frequent, and persistent flights of the

Growlers and other aircraft over and in close proximity to Plaintiff's and the Class members' properties have substantially interfered with their use and enjoyment of their properties and have diminished, if not destroyed, the Plaintiff's and the Class members' property values.

61.     The interference with Plaintiff's and the Class members' use and enjoyment of their properties is substantial, and the diminution in value of their properties constitutes a taking of their private property for public use by Defendant.

62.     Plaintiff and the Class are entitled to just compensation for the value of the properties taken, and the diminution in value to any remaining property not taken or partially taken, under the Fifth Amendment to the Constitution. Despite the increase and change in the nature of NASWI flight operations interfering with Plaintiff's and the Class members' quiet enjoyment and use of their properties and destroying their value, the Navy has not provided, or offered to provide, compensation to Plaintiff and the Class. Plaintiff and the Class must therefore incur significant expense in an effort to recover just compensation for Defendant's taking, including without limitation retaining lawyers and experts to file suit.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Terry Cays, individually and on behalf of a Class of similarly situated individuals, prays for the following relief:

A.     Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff Terry Cays as the representative of the Class, and appointing his counsel as class counsel;

B.     Declaring that Defendant's actions constitute a taking under the Fifth Amendment of the United States Constitution;

C.     Awarding just compensation, restitution, and damages to Plaintiff and the putative

Class in an amount to be determined at trial to which his is entitled under the Fifth Amendment to the Constitution;

  D. Awarding Plaintiff and the Class their reasonable litigation expenses and attorneys' fees, including reasonable costs, disbursements, and expenses for appraisal, engineering, and other expert fees;

  E. Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiff;

  F. Awarding injunctive relief as necessary to protect the interests of Plaintiff and the Class;

  G. Awarding Plaintiff and the Class pre- and post-judgment interest to the extent allowable; and

  H. Awarding such other and further relief as equity and justice may require.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury for all issues so triable.

Dated: September 10, 2020  Respectfully submitted,

  **TERRY CAYS,** individually and on behalf of similarly situated individuals,

  By: /s/  Benjamin H. Richman
     One of Plaintiff's Attorneys

  Benjamin H. Richman
  brichman@edelson.com
  EDELSON PC

350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
T: 312.589.6370
F: 312.589.6378

*Attorney of Record for Plaintiff*

Robert Teel*
lawoffice@rlteel.com
LAW OFFICE OF ROBERT L. TEEL
1425 Broadway, Mail Code: 20-6690
Seattle, Washington 98122
T: (866) 833-5529
F: (855) 609-6911

Ronald A. Marron*
ron@consumersadvocates.com
LAW OFFICES OF RONALD A. MARRON, APLC
651 Arroyo Drive
San Diego, California 92103
T: (619) 696-9006
F: (619) 564-6665

*Admission to be sought