IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| TERRY CAYS,<br><br>   *Plaintiff,*<br><br>  v.<br><br>THE UNITED STATES OF AMERICA,<br><br>   *Defendant.* | No. 20-1174 L<br><br>Honorable Thompson M. Dietz |

**FIRST AMENDED COMPLAINT FOR INVERSE CONDEMNATION**

  Plaintiff Terry Cays ("Cays" or "Plaintiff") brings this First Amended Complaint against the United States of America (the "United States" or "Defendant") to, without limitation, obtain just compensation for a taking that substantially interfered with Plaintiff's use and enjoyment of his real property by the operation of EA-I8G "Growler" jets from Naval Air Station Whidbey Island ("NASWI" or "Ault Field") and the Naval Outlying Landing Field Coupeville ("NOLF Coupeville" or "NOLF") over and around Plaintiff's property. Plaintiff alleges as follows based upon personal knowledge as to himself and his own acts, and on information and belief as to all other matters.

**STATEMENT OF JURISDICTION**

  1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1491(a)(1) as this action seeks compensation from the United States, pursuant to the Fifth Amendment to the U.S. Constitution, for the taking of Plaintiff's private property for public use without just compensation.

1

## PARTIES

2. Plaintiff Terry Cays is an individual and, at all times relevant, has been a resident of Washington state, as well as an owner of real property on Whidbey Island, in Island County, Washington (the "Island").

3. Defendant is the United States of America, acting through the Department of Defense, Department of the Navy, which at all times relevant operated, and was responsible for all flight operations in connection with, NASWI and NOLF on the Island.

## NATURE OF THE ACTION

4. NASWI is a naval air station of the United States Navy (the "Navy") located on two pieces of land near the Island's City of Oak Harbor and Central Whidbey's Town of Coupeville. The combined population of Central Whidbey Island, the City of Oak Harbor, and North Whidbey Island where the Navy operates is approximately 73,000 as of 2017.

5. The main portion of the NASWI base known as Ault Field is located in Oak Harbor. Ault Field is a busy, multi-mission 24-hour-a-day operational facility. NASWI supports the MH-60S Seahawk helicopter and the Boeing EA-18G Growler, P-3C Orion, P-8 Poseidon, EP-3E SPIRAL 3.2.5 MERLIN, and C-40 Clipper fixed-wing aircraft.

6. The Navy conducts Field Carrier Landing Practice ("FCLP") by carrier-based jets, such as the EA-18G Growler (the "Growler"), at Ault Field and NOLF. Other types of operations are delayed during FCLP training at Ault Field. Due to the increasing density of aircraft operations at NASWI, the Navy uses Ault Field and NOLF Coupeville simultaneously to handle the greater volume of operations and attendant air traffic.

7. An "operation" is defined as either a takeoff or landing. The majority of operations occur at Ault Field. The Navy also uses Ault Field as a backup to the NOLF for FCLP during inclement weather.

8.  During FCLP, the Navy performs repetitive "touch-and-go" landings at airfields, which simulate landing on an aircraft carrier. FCLP training exercises involve groups of aircraft flying in patterns to practice touch-and-go landings.

9.  Each aircraft in turn approaches the runway and touches down, but then takes off again without coming to a stop. The aircraft then loops around and prepares for another landing. During FCLP each aircraft makes multiple touch-and-go landings before stopping to refuel. *See* Figure 1.



**Figure 1**.[1]

10.  When the Navy pilot "touches down" on the landing strip, he or she applies full power to the aircraft to take off. This maneuver often requires the use of afterburners on the aircraft and thus creates excessive noise.

11.  FCLP flight training precedes aircraft carrier landing operations and simulates, as near as practicable, the conditions encountered during such landings.

12.  During takeoff and landing at Ault Field or NOLF, whether during FCLP or otherwise, jet aircraft fly at low altitudes over the many private properties surrounding the landing strip. Noise levels of engines for fighter jets such as the Growler equal or exceed 150 decibels ("dB") at takeoff which is well above the minimum 75 dB noise level identified by the National

---

[1]  Field Carrier Landing Practice, United States Fleet Force Command, previously available at: https://www.public.navy.mil/usff/environmental/Pages/aircrafttraining.aspx

Academy of Sciences Committee on Hearing, Bioacoustics, and Biomechanics as the minimum level at which hearing loss occurs.

13. The Navy has conducted flight operations, including FCLP on Whidbey Island since 1967, but the amount of that use has varied dramatically. From 1967 through 1971, the Navy used the Ault Field and NOLF landing strips extensively. After the Vietnam War ended, the Navy's use of Ault Field and NOLF significantly declined.

14. Following the Vietnam War, the Navy began flying the EA-6B Prowler (the "Prowler") on the Island, and during the 1980's once again began increasing the number of operations and FCLP touch-and-go landings at Ault Field and NOLF. Predictably, litigation ensued[2] and, in addition to paying compensation to Whidbey Island property owners, the Navy ultimately agreed to limit its operations to aircraft with a noise level comparable to, or lower than, the Prowler, and fly fewer flights per year. The Navy had until recently also limited FCLP training flights since the 1990s to weekdays, not after 10:30 p.m., and with no more than two consecutive days of touch-and-go operations.

15. In and around January 2009, the Navy began accepting its first Growlers to replace the EA-6B Prowlers. The Growlers are equipped with two General Electric F414 engines capable of producing 14,000 pounds of thrust each and 22,000 pounds of thrust with the afterburner. By comparison, the outgoing Prowlers only produced 10,400 pounds of thrust from each one of its two turbojet engines.

16. Since the Growler was first introduced in and around 2009, the number of flights and operations at Ault Field and the NOLF has risen. Commencing in and around 2012-2013, the Navy began planning to further increase flight operations at Ault Field and the NOLF with additional

---

[2] *See, e.g.*, *Argent v. United States*, 124 F.3d 1277, 1278 (Fed. Cir. 1997).

Growler jets. The Navy officially released its draft Environmental Impact Statement in November 2016, publicly announcing its plans to make NASWI the center of activity for all Growler operations. *See* Figure 2.



**Figure 2**.[3]

17. Then, on or about June 25, 2018, the Navy announced it was relocating 36 additional Growlers and supporting personnel to NASWI. The Navy published its final Environmental Impact Statement ("EIS") on September 28, 2018.[4] On March 8, 2019, the Navy announced its decision under Section 106 of the National Historic Preservation Act to centralize and expand Growler squadron operations on the Island even though it would have a harmful effect on the Central Whidbey Island Historic District.

---

[3] Growler Aircraft Operations at NAS Whidbey Island and OLF Coupeville, previously available at:
https://www.cnic.navy.mil/content/dam/cnic/cnrnw/pdfs/NASWIfactsheets/Whidbey%20Island%20Growler%20OPS%20OLF%20Brochure.pdf.

[4] Environmental Impact Statement for EA-18G "Growler" Airfield Operations at Naval Air Station Whidbey Island Complex, WA, September 2018, prepared by United States Department of the Navy.

18. On or about March 12, 2019, the Navy made final its decision to bring 36 additional Growler jets to the NASWI, bringing the total number to 112. Under the March 12, 2019, Record of Decision (the "Record of Decision") for the Final Environmental Impact Statement for EA-18G Growler Airfield Operations at Naval Air Station Whidbey Island Complex, Island County, Washington, the Navy would not only add 36 Growler aircraft to Naval Air Station Whidbey, but also increase the number of operations from 84,700 to 112,100, including an increase in total FCLP operations from 17,400 to 29,600.

19. The Navy's decision established two new expeditionary squadrons at NASWI. The Navy's Record of Decision states that an estimated 112,100 operations would occur annually, with 88,000 operations at the busy, multi-mission Ault Field and 24,100[5] at NOLF Coupeville. Thus, roughly three out of four total aircraft operations would be supported by Ault Field when compared to NOLF. Specifically, the Navy would conduct 97,500 of the FCLP operations by Growlers, 73,800 of which would be at Ault Field and 23,700 of the operations at NOLF Coupeville.

20. The Navy's increased and continued ramping up of Growler flight operations, including touch-and-go practices and changes in flight patterns, at Ault Field and NOLF Coupeville has resulted in an increase in overflights around and directly over Plaintiff's property. The flights occur in the afternoons and evenings, and night flights have occurred several times per week and continued into early mornings.

---

[5] Each operation translates to 12,050 touch-and-go flights at NOLF.

6



**Figure 3**.[6]

21.     Prior to 2016, there were approximately 64,300 Growler operations at Ault Field. As of the filing of Plaintiff's original complaint in this matter, the Navy was increasing Growler operations at Ault Field by nearly 10,000, to a total of 73,800 operations. In addition to the increase in Growler operations, the actual manner in which the Growler operations are conducted has been significantly different from the flight patterns of prior operations, resulting in high average DNL (also known as the Day-Night Average Sound Levels) noise contours in the area. *See* Figure 3.

---

[6]     Previously available at: https://www.cnic.navy.mil/content/dam/cnic/cnrnw/pdfs/NASWIfactsheets/Whidbey%20Island%20Growler%20OPS%20OLF%20Brochure.pdf.

22.     Prior to the filing of Plaintiff's original complaint in this matter, the Navy's website stated that "flying can occur any day of the week depending on mission needs" and on weekends if "dictated by mission needs."[7] The Navy admitted it could not predict how impactful increased Growler and other aircraft operations on Island residents would be as the number of Growler and other aircraft at NASWI continued to steadily increase.

23.     The Noise Control Act of 1972, 42 U.S.C. § 4901 *et seq.*, requires federal agencies, and state and local governments to develop measures to control the harmful effects of noise on the public. To conform with the Noise Control Act, the Department of Defense initiated the Air Installation Compatible Use Zone ("AICUZ") program to protect the public's health, safety and welfare, and to prevent encroachment on military installations.

24.     The AICUZ program identifies uses that are compatible and incompatible with noise levels emanating from activities on military installations. One part of the AICUZ program is to prepare a noise study to define noise exposure contours. In other words, a map showing a graphical display of noise impacts from air operations on the surrounding property.

25.     At the time of filing Plaintiff's original complaint, the AICUZ map generally showed three noise exposure contours: (a) 65-69 dB DNL; (b) 70-74 dB DNL; and (c) 75 dB DM, and greater. *See* Figure 4 (on the following page).

---

[7]     *See* EA-18G Growler Airfield Operations, previously available at: https://www.cnic.navy.mil/regions/cnrnw/installations/nas_whidbey_island/om/environmental_support/growler-fact.html.



**Figure 4**.[8]

---

[8] Previously available at: https://www.islandcountywa.gov/maps/Documents/noisezones_small.pdf.

26. Defendant, by its internal regulations known as Operational Naval Instructions ("OPNAVINST") and by general publication, determined that properties located within a 65 dB DNL noise zone and greater are unsuitable for residential use and development. *See* Figure 5.

**Suggested Land Use Compatibility in Noise Zones**

| Residential Categories | Noise Zone 1 (dB DNL) | | Noise Zone 2 (dB DNL) | | Noise Zone 3 (dB DNL) | | |
|---|---|---|---|---|---|---|---|
| | < 55 | 55-64 | 65-69 | 70-74 | 75-79 | 80-84 | 85 + |
| Single units; detached | Y | Y¹ | N¹ | N¹ | N | N | N |
| Single units; semi-detached | Y | Y¹ | N¹ | N¹ | N | N | N |
| Single units; attached row | Y | Y¹ | N¹ | N¹ | N | N | N |
| Two units; side-by-side | Y | Y¹ | N¹ | N¹ | N | N | N |
| Two units; one above the other | Y | Y¹ | N¹ | N¹ | N | N | N |
| Apartments; walk-up | Y | Y¹ | N¹ | N¹ | N | N | N |
| Apartments; elevator | Y | Y¹ | N¹ | N¹ | N | N | N |
| Group quarters | Y | Y¹ | N¹ | N¹ | N | N | N |
| Residential hotels | Y | Y¹ | N¹ | N¹ | N | N | N |
| Mobile home parks or courts | Y | Y¹ | N | N | N | N | N |
| Transient lodgings | Y | Y¹ | N¹ | N¹ | N¹ | N | N |
| Other residential | Y | Y¹ | N¹ | N¹ | N | N | N |

**Figure 5**.

27. The Navy warned Island residents of "a significant impact on the noise environment" on the Island,[9] reflecting the reality that more people would hear noise more often. According to the Navy, the increase in aircraft operations also means the average decibel level will increase in areas near runways such that significantly more people will be living within the 65- decibel or above day-night average sound level contour of the noise map in the future as a result of increasing Growler flight operations.[10]

28. The Navy also admitted that the increase in aircraft noise has a real effect on property values,[11] citing a 1991 study by Marvin Frankel which found that in instances of real estate impacted

---

[9] *See* EIS, Volume 1, Executive Summary at pg. ES-5, "Therefore, the Proposed Action would have a significant impact on the noise environment as it relates to aircraft operations at the NAS Whidbey Island complex."

[10] *See* Record of Decision at pg. 8.

[11] *See* EIS Volume 2, Appendix A1, § A1.3.8 "Property Values" at pg. A1-54. "Economic studies of property values based on selling prices and noise have been conducted to find a direct relation. Studies of the effects of aviation noise on property values are highly complex due to differing community environments, market conditions, and methodological approaches, so study

11

by aircraft noise, "a significant segment of buyers lacked adequate information about the noise environment and often overbid, only to be disappointed after purchase."[12]

29. The Navy admitted that property owners who acquired or purchased their property when the location was not experiencing aircraft noise are the most significantly impacted.

> "Frankel classified noise-affected property owners into two groups: one that moved to the location while the environment was quiet but later became noise-impacted and another that purchased from a previous owner while the property was already noise impacted. Frankel concluded that the former group members bore the true financial burden of airport noise."[13]

The Navy also admitted that property values and prices suffer from significant discounts as a result of the negative impact of aircraft noise and from increased flight operations.[14] Those owners who acquired or purchased their property after flight operations were already occurring, but later experienced an increase in aircraft noise, also experience monetary loss.[15]

---

results generally *range from some negative impacts to significant negative impacts*." (Emphasis added.)

[12] *Id.* citing Frankel, M., (1991), "Aircraft noise and residential property values: Results of a survey study," *The Appraisal Journal*, Jan. 1991, pp. 96–108.

[13] *Id.*

[14] *Id.* at pg. A1-55 "Enough data are available to conclude that aircraft noise has a real effect on property values. This effect falls in the range of 0.2 to 2.0 percent per dB, with the average on the order of 0.5 percent per dB."

[15] "The Effects of Aircraft Noise and Airport Activity on residential Property Values: A Survey Study," BEBR Faculty Working Paper No. 1450, 1-58, College of Commerce and Business Administration, University of Illinois Urbana-Champaign (April 1988). *See also* Frankel, Marvin. "The Impact of Aircraft Noise on Residential Property Values," Illinois Business Review, Vol. 45, No. 5, 8-13 (Oct. 1988).

**FACTS SPECIFIC TO PLAINTIFF CAYS' PROPERTY**

30. At all relevant times, Plaintiff Cays has owned property in Oak Harbor adjacent to Dugualla Bay and less than three miles east of Ault Field. This property is located within a noise counter zone in excess of 65 dB DNL.

31. The Navy's FCLP training results in Growlers and other aircraft flying at low altitude around and/or over Plaintiff Cays' property, accompanied by excessive noise in and around his home.

32. The Navy's increase of FCLP operations has led to excessive jet noise at various times during the day and in the middle of the night continuing into the early morning. For example, Plaintiff Cays has been affected by the Navy's FCLP training that, on many occasions, commenced as late as 9 pm and continued until 2 am.

33. As a result, the Navy's activity has substantially interfered with Plaintiff Cays' use and enjoyment of his property and has diminished, if not destroyed, his property value.

**COUNT I**
**Inverse Condemnation**
**Under the Fifth Amendment of the United States Constitution**

34. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

35. The Fifth Amendment to the United States Constitution prohibits the Government from taking private property for public use without just compensation.

36. Plaintiff has a legally protectable interest in his real property.

37. The flight paths of the various patterns for flight operations at NASWI and NOLF, were and are over and/or in close proximity to the Plaintiff's real property.

38. The additional operations from the Growler jets and other aircraft as set forth herein dramatically increased the number of flight operations at NASWI and NOLF. In addition, the

Growlers produce significantly higher levels of vibration, and are louder than predecessor aircraft such as the Prowler.

39. The noise and vibration from the regular, frequent, and persistent flights of the Growlers and other aircraft over and in close proximity to Plaintiff's property have substantially interfered with his use and enjoyment of the property and have diminished, if not destroyed, the property's value.

40. The interference with Plaintiff's use and enjoyment of his property is substantial, and the diminution in value of the property constitutes a taking by Defendant of his private property for public use.

41. Plaintiff is entitled to just compensation for the value of the property taken, and the diminution in value to any remaining property not taken or partially taken, under the Fifth Amendment to the Constitution. Despite the increase and change in the nature of NASWI flight operations interfering with Plaintiff's use and enjoyment of his property and destroying the property's value, the Navy has not provided, or offered to provide, compensation to Plaintiff. Plaintiff must therefore incur significant expense in an effort to recover just compensation for Defendant's taking, including without limitation, expenses related to retaining lawyers and experts to file suit and the attendant costs of such litigation.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Terry Cays prays for the following relief:

A. A declaration that Defendant's actions constitute a taking under the Fifth Amendment to the United States Constitution;

B. An award of just compensation in an amount to be determined at trial to which he is entitled under the Fifth Amendment to the Constitution;

C. An award of his reasonable litigation expenses and attorneys' fees, including reasonable costs and expenses for appraisal, engineering, and other expert fees;

D. Declaratory, injunctive and other equitable relief as is necessary to protect Plaintiff's interests;

E. An award of pre- and post-judgment interest to the extent allowable; and

F. Such other and further relief as equity and justice may require.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues so triable.

\*     \*     \*

Respectfully submitted,

**TERRY CAYS,**

Dated: September 29, 2023       By: /s/ Benjamin H. Richman
One of Plaintiff's Attorneys

Benjamin H. Richman
brichman@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
T: 312.589.6370
F: 312.589.6378

*Attorney of Record for Plaintiff*